in the case of Scalia v. Wynnewood Refining, 1995-3-3, and in the Cross Appeal, 1995-7-8. And I understand that Petitioner's Counselors are going to split their time. Is that correct? That's correct, Your Honor. All right. So just remember what Kevin said at the outset of today's session, that Petitioner's Counselors are responsible for managing the clock. We'll try our best. There's a lot here, so we'll hear first from Petitioner's Counsel. Yes, Your Honor. I will do my best to stop at about 10 minutes, so I say five minutes for my partner, Mr. Kahn, to respond to the government's appeal. May it please the Court, my name is Micah Smith, and I'm counsel for Wynnewood Refining. The outcome of this case turns on the definition of one word, process, and your decision will determine how far the government can stretch that term. As an initial matter, the process safety management standard, the PSM standard, was mandated by Congress in response to a series of large, catastrophic releases of chemicals that each resulted in tens, hundreds, or even thousands of deaths. Congress required OSHA to create a standard that could prevent such releases, and the PSM standard was the result. Because of its purpose, the PSM standard has only limited applicability. It can only apply in a workplace where an employer has a threshold quantity of a highly hazardous chemical. In this case, the hazardous chemical is flammable gas, and the PSM standard sets the threshold quantity for flammable gas at 10,000 pounds. But even when a threshold quantity exists at a worksite, the PSM standard doesn't apply to every square inch of that worksite. It only applies to the process that involves the threshold quantity of the chemical. So the standard requires us to engage in a line-drawing exercise to identify the boundaries of the process, so we know to which equipment the standard applies. Now, this line-drawing exercise tells us the limits of OSHA's ability to enforce the PSM standard. Winniewood doesn't argue that safety is unimportant for steam boilers, nor do we argue that OSHA lacks the authority to regulate safety for steam boilers. In fact, OSHA has historically used the OSHAX General Duty Clause to cite unsafe boiler operations. OSHA could also promulgate a standard to specifically address steam boiler safety if OSHA wishes to do so. But rather than using its legitimate authority to address the tragic accident that occurred at Winniewood, OSHA decided to stretch the PSM standard far beyond what a fair reading of the application can allow, and beyond what it has traditionally enforced the standard. This is a case of first impression. It's the first time that the Review Commission, OSHRA, has extended the PSM standard this far, and we're asking you today to reject their overreach. Now, this case requires you to decide whether the PSM standard applies to a steam boiler, a piece of equipment that does not contain 10,000 pounds of flammable gas. It actually contains only water that is heated to produce steam. So, to justify the extension of the PSM standard to this equipment, OSHRA incorrectly decided that the FCC unit, which is a covered process at Winniewood that does contain a threshold quantity of flammable gas, that the FCC unit and the steam process because of interconnection and co-location. But in drawing the boundary lines of process this way, OSHRA threatened to make the reach of the PSM standard nearly limitless. OSHRA's logic was this, that the PSM standard could be applied to the boiler via interconnection because the boiler is a vessel, because it could contain water, and because there is an indirect connection between the boiler and the FCC unit. Now, if this is a valid interpretation, it will lead to absurd results. You can apply the PSM standard to a water cooling tower because that tower contains water and has a connection to a covered process. You could also apply it to electrical panels. They arguably contain electricity and provide power to computers that control a covered process. And even though it's obviously absurd, you could apply PSM to a toilet on site. It contains water, and the water line that supplies it is the same line that the PSM standard. Now, having addressed the potential effect of your decision here, we want to turn to the specific way that OSHRA misinterpreted the definition of process. In its decision, OSHRA pursued only a simplistic grammatical analysis, one that was completely unmoored from established legal interpretive principles, meanwhile, ignoring entirely the purpose, structure, and history that is evident in the standard itself and is even more clear in the preamble to the standard. Now, the Supreme Court has made it clear that properly interpreting a regulation like the PSM standard requires much more analysis than OSHRA provided. This case deserves a robust analysis, one that uses all the tools in the interpretive toolbox, as Justice Kagan wrote in last year's Kaiser decision. And if you do this level of analysis and consider the text, structure, history, and purpose of the PSM standard, including the standards preamble, you'll have no choice but to reverse OSHRA's decision. Now, to affirm OSHRA's decision, you have to adopt their specific text-focused interpretation, which is not the best interpretation, even if we look solely at the text, and it's an interpretation that directly contradicts the structure, history, and purpose of the standard. There are three errors in OSHRA's analysis that we want to highlight. First, the holding that the PSM standard can only apply to a vessel containing highly hazardous chemicals. I'm sorry. This is the correct holding that OSHRA got wrong. The correct holding would be that the PSM standard can only apply to a vessel containing highly hazardous chemicals. The second is that if the vessels containing highly hazardous chemicals are connected, the PSM standard can be considered a single process only if they could be involved in a potential release. Finally, the PSM coverage requires the government to show more than a theoretical possibility that two vessels could be involved in a potential release, whether for co-location or interconnection purposes. That proof must be made. Now, focusing on the first element here that I mentioned, the fact that the PSM standard cannot apply to vessels that don't contain highly hazardous chemicals. The PSM standard, by its definition, allows the aggregation of quantities in multiple vessels. That text allows any group of vessels which are interconnected and separate vessels which are located such that a highly hazardous chemical could be involved in a potential release shall be considered a single process. OSHRA's decision departs from the purpose of the standard, which is to prevent the release highly hazardous chemicals. If you allow OSHRA to extend PSM coverage to include vessels which do not themselves contain highly hazardous chemicals, how does that serve the purpose of the standard? There's no way for the standard to prevent the release of a highly hazardous chemical from a vessel that doesn't contain a highly hazardous chemical. Now, this fact that's evident in the PSM standard, this sentence was added in only the final version of the PSM standard. It wasn't included in the Notice of Proposed Rulemaking. And because it was added late, OSHRA explained why it was added, saying that this new sentence has been added to clarify the fact that interconnected and nearby vessels containing a highly hazardous chemical would be considered part of a single process. The preamble makes clear what the text has already suggested. The PSM standard can't apply to vessels like the steamboiler that don't contain highly hazardous chemicals. If you reach the right conclusion on this element, the case is over. That's it. The steamboiler does not contain highly hazardous chemicals. Based on that, there's no way to extend coverage of the PSM standard to that vessel, and we can end the analysis right there. We can leave off the entire discussion of successorship. Now, there's another element. What about the word involving? If you accept that this is part of the process, process means any activity involving a highly hazardous chemical. Why doesn't that word all by itself resolve your claim that the vessel that's part of the process has to contain an HHC? Well, you're right. I think that's an excellent point, and I do think that you can end the analysis right there by focusing on the lack of the highly hazardous chemical there. Now, what we have been responding to largely is the analysis provided by OSHRC, which essentially skipped over that first part of PSM applicability, and we've been focusing on the second sentence of the definition of process. Historically, most people have read the word involved to be very broad, and in the interest of time and space in our briefs and this argument, we've focused on what we think is essentially a locked down argument, but we absolutely agree that to the extent that this steamboiler doesn't contain a highly hazardous chemical, it's not a process that involves a chemical. Now, I would point next to OSHA. The government in their brief argued that our arguments rely entirely on the preamble standard, and in fact, we're deviating from the text of the standard. I wanted to point out, and this relates to the idea that interconnection requires proof that vessels can be involved in a potential release, that the text-based definition that we offer is the best definition, the best interpretation, even if we focus solely on the text and ignore the preamble. OSHRC used essentially no legal analysis, pointed to commas and a which, and the fact that one part of the definition could stand on its own and the other couldn't, to conclude that the linkage between vessels and the relation to a potential release means that it only applies to co-location, not to interconnection. But as we noted, the series qualifier canon makes it clear, if you apply this canon, that where there are straightforward parallel construction that involves the nouns or verbs in a series, a post-positive modifier applies to the entire series. That canon makes clear that the best interpretation here is to apply this causal nexus, both to the co-location problem and to the interconnection problem. Now... How do you get there? How does... Sorry, Judge Moritz again. I'm not following your argument on that at all. How do you find that separate vessels, which are located, stands alone? That you can't... How does that possibly stand alone as a phrase? It's clear to me that you've got to have... That has to be the modifying phrase, such that a highly hazardous chemical could be involved in a potential release. Your theory requires us to say that the phrase separate vessels, which are located, somehow stands alone. Your Honor, I would disagree that our interpretation requires you to come to that diagram sentence in the two ways that this could be read. It is true that separate vessels, which are located, can't stand on its own without such that clause. But that doesn't mean that the first provision, which can stand on its own, must stand on its own. It is still a parallel construction, any group of vessels and separate vessels. Now, they both have a subject. They both are followed by a which clause. One is better able to stand on its own, but they are a series. They're items in a list. And there is this post-positive qualifier. And we think that, even based on the text, that this is the best reading to apply it there. And even going beyond the text... I'm sorry. This is the... Sorry. Even going beyond the text, if you were to reach that conclusion, you would have to ignore the preamble and conclude that we'll reach a conclusion based on the text that is in complete contradiction to the words in the preamble. To say that OSHA was contradicting itself between the words of standards and the words in the preamble it wrote contemporaneously. Well, why doesn't the 2007 interpretation, and I think I'm looking at if you're going beyond the text, and that's a question here, but if you are, why doesn't the that interpretation I'm reading... In other words, OSHA's intent is that the phrase, which are located such that a highly hazardous chemical could be involved in the potential release, modifies only the immediately preceding separate vessels, making the entire phrase parallel to the freestanding phrase, any group of vessels which are interconnected. There is no additional requirement on OSHA to show the potentiality of a release with respect to connected as opposed to separate vessels. Why doesn't that answer this question if you're looking outside the text? Well, Your Honor, we would encourage you to look outside the text at the essentially what we would say is the meaning of the standard. The plain meaning relates to the text that was issued at the time the text was issued as well as the preamble that was issued. The 2007 interpretation letter is essentially the same as OSHA's enforcement decision in this case, which was made in 2012. It's not appropriate for an agency to promulgate a standard, to identify a meaning of that standard, and to then later change the meaning of that standard to have a different meaning. Well, you have to accept the argument that it's changed. Don't we have to accept your argument that they changed it in order to divide up? Absolutely. Yes, Your Honor, you would have to come to the conclusion that the preamble reads differently than the 2007 interpretation letter. And I think it's clear that those two things do read differently. I need to make sure I stop so that I can reserve some time for Mr. Kahn. So, I'll apologize and stop there. Yeah. So, I will assure the Petitioner's Council that I am going to let you all have rebuttal time. But I do want to make sure that all of my colleagues have an ample opportunity to get their questions answered. So, don't worry about your rebuttal time. Judge Morris, do you have any additional questions? No, I don't. Thank you. Okay. Judge Murphy, do you? No. I have no questions. All right. I do have one question, and that is, with regard to both the definition and the regulations for process, as well as the principal provision in the preamble that you're relying on for your first argument, that both an interconnected vessel, as well as a nearby or co-located vessel, have to contain an HHC, what about OSHA's argument or the Secretary's argument that both the second sentence of the definition, as well as the preamble, are simply saying that, in adding the second sentence to the standard, that OSHA was simply trying to figure out a solution if there were two interconnected vessels or that were co-located in proximity to one another, that to get to the 10,000-pound threshold to trigger the PSM standard, that you would aggregate those quantities. But it wasn't necessarily saying that, either in the second sentence of the definition or the preamble, that both of the aggregated vessels have to independently contain HHC. I may misunderstand your question, so I'll try to answer it as I understand it. Well, don't get it. I don't want to make it a clear question, so I'll try it again. So, the second sentence of the definition that you're relying on and the preamble, which contains similar language, are both talking about the aggregation of quantities of HHC in order to reach a sum that would equal or exceed 10,000 pounds to trigger the PSM standard. So, what I'm asking is, why is that reasonable interpretation of the second sentence of the definition, as well as the preamble, why does that imply that both of the interconnected or proximate vessels have to independently contain HHC? After all, one of the vessels, say, from the FCCU unit to the field run, might itself contain 10,000 pounds or more of HHC. Why does the second sentence necessarily or even most reasonably imply that each of the vessels have to contain HHC? So, to begin with, your honor, I would agree that the purpose of adding, you know, this provision was to rope in additional vessels that contain highly hazardous chemicals that otherwise might escape regulation, right? It doesn't matter whether there are 5,000-pound vessels right next to each other interconnected or one vessel containing 25,000 pounds. The risk of a catastrophic release from those two are essentially the same, given that arrangement. So, I agree with that. I think that the best way to respond to this is to then focus on what would happen if those words were not added, if we hadn't added that second sentence. The words of the standard, they focus on applying the PSM standard to a process involving a chemical at or above the threshold quantity. So, without these words, it would clearly not apply to a vessel not containing a threshold quantity of highly hazardous chemicals. So, OSHA's argument in this regard says, all right, so the original standard only applied to a vessel which contained a threshold quantity. We're going to add this provision that will extend coverage to vessels which all contain highly hazardous chemicals and which added together contain that threshold quantity. And also, beyond that obvious and clear meaning of the text and adding that to achieve that goal, it's also now going to mean that we're going to extend PSM to also cover vessels that don't contain a highly hazardous chemical. I don't think there's anything in the record, in the standard, in the preamble that suggests that OSHA was trying to go beyond threshold quantities of covered chemicals. OSHA has the ability to regulate any workplace hazard, either through its general duty clause or specific standard. It had a specific purpose with the PSM standard. It's accomplished by focusing on those quantities of highly hazardous chemicals. And to read it in a different way, I think, departs from the meaning of the standard. Okay. Okay. Thank you very much. Thank you. We'll hear from Respondents Council. May it please the Court. Ron Gottlieb for the Secretary of Labor. The petitions in these cases raise two primary issues. One is Wood's petition raises the issue of whether the Commission correctly concluded that the process safety management standard applied to a boiler that performed various process-related functions for covered process. The Secretary's petition raises the issue of whether the Commission misapplied the legal test for determining successful liability under the OSHA Act. The Commission correctly found that the PSM standard applied to the boiler, but it misapplied the legal test for successful liability. As the disputed language in the definition of process states that any group of interconnected vessels, any group of vessels which are interconnected and separate vessels which are located such that a highly hazardous chemical could be involved in potential release shall constitute one process. The Commission correctly determined that this language does not require the Secretary to prove that a group of interconnected vessels should be, could be involved in a potential release because that is a separate and complete condition for constituting a process. And when that condition is satisfied, the standard presumes that the group of interconnected vessels could be involved in a release. And the Commission also determined that not every vessel in a group of interconnected vessels, group of interconnected vessels has to contain a highly hazardous chemical. Woody Wood challenges both aspects of this determination. But the Secretary agrees with the questioning from the Court regarding the series qualifier canon. The second in what item in their series of separate vessels located is simply not, which are located is simply not an item because it's an incomplete item. And therefore the such that language is needed to complete that item and does not modify the group of interconnected vessels. Counsel, this is Judge Moritz, if I may interrupt for a moment on that point. I addressed with Appellant for Counsel the 2007 interpretation that seems to agree with the interpretation of the text that you are advocating here, but I didn't see where you cited that 2007 interpretation in discussing the extra textual materials regarding that issue. And I wondered if there's some reason why. Well, I think we think that the text is plain. I understand. If we go outside the text, and you did in your briefing alternatively address extra textual items, various items to support your textual reading, I wondered why you did not address what seems to be right on point in this 2007 interpretation. I thought we did, at least somewhere. Maybe we didn't feature it as prominently as we should have. But we certainly agree that that interpretation makes it abundantly clear that it's, but it's always been our interpretation. And I don't think there's anything inconsistent said in either the preamble or any interpretive letters that are part of the record. But, you know, primarily because we think the text is clear, we didn't rely on extra textual materials to support our interpretation. I understood that. I think that, well, never mind. I agree that the 2007 interpretation squarely establishes that the Secretary has always believed that these were two independent conditions and that we had no obligation to prove that a vessel was involved in a potential release. There's also no, and Woody Wood basically agrees with it, there's no textual basis for saying that all of the vessels have to contain highly hazardous chemicals. And they rely on the preamble and the explanation that OSHA would consider all quantities in a group of vessels and separate vessels to make sure that their employers could not avoid the coverage of the standard. But that does not imply in any way that a vessel that's part of a group of vessels that doesn't have highly hazardous chemicals is excluded from the group. Well, can I ask you why you say that? So they're relying on a preamble that says that the purpose is to clarify the fact that interconnected and nearby vessels containing a highly hazardous chemical would be considered part of the CEQA process, end quote. It's from the 57 Federal Register 6372. So why doesn't that unambiguously state that the purpose for sentence two was to make sure that both interconnected and nearby vessels can be considered part of a single process, but only if they both contain an HHC? Well, OSHA adopted this language because there was a little bit of confusion, but there was nothing that OSHA had said that the standard applies only to vessels that contain threshold quantities. It clarified the preceding sentence that talked about a non-exhaustive but broad list of activities that involve highly hazardous chemicals. And so it was giving that as an example of what that a group of interconnected vessels is an activity that involves highly hazardous chemicals. The blow is used for both performing performance-related functions and stripping materials from the substance, both basically in the manufacturing process and also in storing or using one of the products of the process. Okay. In fact, their argument would basically exclude a group of vessels or exclude a vessel that had a catalyst that was required for multiple parts of the vessel for other groups, other vessels in the group. But if the catalyst was in a highly hazardous chemical, it wouldn't be part of the group of vessels. Well, it could be process equipment though, right? Well, that's another reason why the Secretary's interpretation can make sense is that every process equipment is covered by the standard. And this is clearly process equipment because it's using the process. But the OSHRC said that the Secretary, you can't defend including the Wix boiler under the PSM standard based on the process equipment theory because the Secretary is not relying on the process equipment theory in the litigation. It's relied only on the interconnection co-location theory. And that's why the OSHRC rejected the theory that you're... No, the Commission said it didn't have to get into what involved meant in this context because the second sentence said that this is an example of what involved means. And so it didn't have to say, well, you know, is this manufacturing or is this, in what particular way is it using that highly hazardous chemical? But it didn't say that that's not process equipment or that we couldn't rely on the fact because process equipment is covered by the standard that therefore it can also include vessels that are part of the... That meet the definition of a group of vessels that are interconnected. I'm not sure... Does that answer your question? I'm not sure if I... Sure. Yeah. Okay. Thank you. I just wanted to point out that the opening brief did not challenge the definition of interconnection and or defining that the vessels were interconnected. So I don't think they're allowed to... So the issue that they raise in their reply brief has been forfeited, but I wanted to point out that interconnected... And the Commission, they claim the Commission erred in adopting the definition of interconnected that allows for indirect connections. But the term is used in a group of vessels. So it's clear that OSHA intended to include indirect connections. And indeed, they assert that... They appear to agree that interconnection includes connection between... Mutual connections between two things and the vessels here. And the boiler was mutually connected to... I'm sorry, the boiler and the FCC and the output units were mutually connected via the CO steam drum and the fuel drum. It's not true that there'll be no limit to the standard. As I said, the Commission plainly relied on the process pass that the boiler performed. In addition, they claim that we've historically used a general duty clause, but in the preamble and in the CPL, which was adopted, which is a compliance directive that was adopted a year or two after the promulgation of the boiler, that are used in processes as part of a covered process, all covered by the process safety management standard. Winningwood is incorrect that you can avoid the successorship issue if it's not covered by the WIC spoiler. So, you would still have to address the successorship issue. And we think it's clear that the Commission misapplied the legal test for successorship. The Commission was required to consider the totality of the circumstances to determine if Winningwood LLC substantially continued the refinery operations, business operations of Winningwood Company. The Commission did not engage in this analysis and said it held that it could not be found to be a successor based on one of three factors that it uses to conduct the overall inquiry. That factor, the safety of personnel, the substantial continuity of safety personnel, it ruled did not favor successorship because two executives impressed upon Winningwood to comply with its safety obligations. And Winningwood had a legitimate motive for, or at least was not trying to avoid repeat characterization for it as why it changed its legal identity. This is a misapplication of the personnel factor, as we showed in that brief. Even if they were allowed to consider these factors under the substantial continuity factor, it doesn't support the result because substantial continuity is not the same as complete continuity. I believe I've run out of time, so I'm going to take questions. Okay. Thank you. Yeah. Let me ask Judge Markey, do you have any questions? I do. Mr. Gottlieb, there was a finding both by the ALJ and incorporated by the Commission that the successor corporation had spent $130 million on safety upgrades. When you factor that into the substantial continuity formula, and specifically the continuity of personnel who specifically control decisions related to safety and health, why that doesn't carry the day for these being not repeat violations? And why don't you apply the standard of substantial evidence to that? Well, the investment simply doesn't change the personnel or the working conditions or any of the other factors. I'm not saying it's irrelevant, but it just doesn't outweigh the other evidence of substantial continuity of all of these factors. Also, half of the amount was part of the purchase price. It's not clear how much of that was caused by the turnaround, which is an expensive event of itself. But new investment, I think other cases have involved that. I think the D.C. Circuit case that we started now, we've involved that type of factor. Certainly under the totality of the circumstances, you would be free to consider it, but there's no reason why that would affect the substantial continuity of the personnel at the plant that were making the decisions on a day-to-day basis. But it does reflect upon the type of personnel that are important here, those that can commit to an additional $130 million in upgrades, doesn't it? Well, selling new equipment is helpful, and it's related to safety, but the case law just has not and the commission didn't explain why getting new equipment changes the nature of the business. Well, aren't you now getting into the substantial evidence question? I guess that's my point. No, because as I said, they had to explain why what they ruled as an insufficiency of safety personnel outweighed what they said was two other factors that weighed in favor of successorship. They didn't consider the totality of the circumstances, try to weigh one over the other. They just arbitrarily put this factor into the personnel factor and said, because the personnel factor doesn't support the secretary's position, they're not as successful. And that's just not... I understand that. I understand that. Okay. And I guess I would just add, it's just not the way you put it into a personnel factor. Are there any other questions? Judge Murphy has no more questions. Okay. Judge Moritz? No more questions here. Okay. I'm afraid I do have a few questions and I'll break these up. The first few questions are with regard to Wynnywood's petition. I was a little unclear. Wynnywood anticipates that the secretary was going to rely on our deference. And I was a little unclear from the secretary's briefing on whether you want to rely on our or Kaiser deference. In one point, responding to a point of the petitioner, you said that Kaiser would have limited pertinence here because the review commission did not rely on deference. And you included... There was a couple of sentences in your standard, in your red brief, that referred to our deference. And at the tail end, you did respond to the petitioner's arguments on context and character under the Kaiser test. But you intended to forego reliance on our deference or Kaiser deference? Well, I would call it CF and I deference. But I wouldn't say we forego it. I think if the court disagrees with the plain meaning holding of the commission, then there is the issue of whether our interpretation is reasonable. And you would have to decide whether you can make that determination as a matter of law, one way or the other. And if you can, you could rule on that basis. We think because of the strength of the plain meaning holding, our interpretation is plainly reasonable. If you don't think you can justifiably make that determination based on the briefing, you'd have to remand to let the commission decide whether our interpretation is reasonable. Well, let me follow up on that a little bit. We have cases. In fact, we just issued an opinion just recently at Ace Medical Center that said, because we're a Chevron deference, that it can be waived if the government doesn't invoke it. And I never saw, you know, in all of the briefing in the case on what it was petitioned, I never saw a statement from the secretary that said, yes, if what you just said, if panel, if you determine that the language in the process definition, for example, is ambiguous, that you should defer to the secretary's interpretation or the review commission's interpretation. You never said that. And so why haven't you waived it? Well, I thought we had covered it by addressing their argument that our interpretation was unreasonable. Okay. You know, I don't, I'm not going to second guess the court's decision that we can waive it. But if we did waive it, I think you would have to remand to consider. Okay. Okay. Let me ask you one other question. I think this might be my last question. It's just a hypothetical. Let's say if you have a product that just shoots water into a pipeline, and then that pipeline goes to a field run, and that field run that connects to a different piping system to an SSC unit. With the pipe that contains the water, if all it is is water, would that be considered part of the PSM process, even though there's no risk, there's no HHC in it, there's no possible risk that that would exacerbate any damage from an explosion? Would that piping, that vessel that contains just water, would that be covered by the PSM? If it was sent into the process and used in the process, I would say yes. There are interpretive letters that talk about when you can exclude something that creates no risk of release, or in the utility concept. But the fact that it was part of the process, I think it would make it, it would be process equipment, and it might not have the full gamut of PSM standards. I think there are some interpretive letters that talk about only if it's process equipment that doesn't contain a HHC. Limited provisions might apply if it's not involved in the control of the HHCs and can cause a release. But it wouldn't take it as hard to understand. I understand that. So just to make sure that I understand, so you're saying that that would be covered because of the provision for process equipment, not for what we have in this case, which is the question of whether or not something is covered by the PSM standard because it's either an interconnected vessel or a co-located vessel, right? Well, it doesn't sound like it'd be co-located based on your description. It might be interconnected. You'd have to look at the interconnections and why it was connected. But would there be a reason that OSHA would adopt a regulation that says that even if, just the fortuity that you have a pipeline that's connected to a fuel drum that's connected to other piping that goes into an ALPE unit or an FCCU unit, that just the fortuity that this is a pipeline that has these indirect connections and it just has water in it, not any HHC unit, and it's no risk that it's going to contribute to a release of HHC, what would be the benefit of this? Well, there shouldn't be any fortuity in the process. I mean, it's got to be carefully designed and operated. And the way to prevent catastrophic releases is to safely run it as it was designed to run. Any variation in how it was designed to run, in the Secretary's view, creates the potential for something to go wrong and to cause a release. If somebody could establish that it would be impossible for a release to occur, that would affect the characterization, but it wouldn't affect the coverage or the application of the standard. And it's not true that there is evidence that a mishap with the steam or boiler could cause a release. We don't have the burden to show that for a group of interconnected vessels, but they haven't shown, it's their burden to show that it couldn't cause any release. Okay. Okay. That would only affect the characterization. All right. Okay. Thank you very much. That fully answers my question. Kevin, how much time does the petitioner have? The petitioner has used all their time. Okay. As promised, petitioner, I ate into your time. I know that you were all taking valiant efforts to preserve time. So, petitioner, I'm going to give you four minutes. So, Kevin, if you could put four minutes on the clock. All right. I'm sending it to four minutes right now. Okay. Thank you, Your Honor, and good afternoon. May it please the Court. My name is Eric Kahn, Counsel for Wynnewood Refining. OSHA's authority to issue repeat citations exists to punish the same employer who makes the same decision to violate the same rule more than once. To try and avoid that punishment, some employers have engaged in sham transactions that allow them to continue the same business just under a new name. That's why OSHRC adopted its three-factor substantial continuity test, so those employers could not escape the heightened consequences of their repeated decisions to violate the law. If you remember only three things about successorship from today's argument, let it be these three. First, the primary purpose of OSHRC successorship tests is to defeat those kinds of efforts by employers to purposefully evade repeat liability by engaging in sham transactions. The Commission has only applied successorship four times ever, and in each time, it was in the context of a sole proprietor changing the company name and continuing to operate the same business still under his own exclusive control. CVR's acquisition of the refinery in this case was no sham. It was a half-billion-dollar arm's-length transaction that brought in a new corporate parent to control the refinery. If they had spent $100 instead of $130 million, how would that necessarily reflect differently on the personnel under the third factor? I think it would not reflect on the personnel aspect of the test, but I think it goes more towards the purpose of the test, whether there is a sham transaction, whether it was intended to just evade repeat responsibility rather than to actually engage in real commerce and make a proper transfer of control of a company. The idea that this was a significant corporate transaction is relevant to the purpose of the who controls safety decisions. The second important point I wanted to leave with you today is that that is the most important factor in the substantial continuity test for that very reason, because it is a focus on the potential for a sham transaction is the continuity of the personnel who specifically control decisions related to safety. The best way to tell who that is, as Judge Murphy noted, is to follow the money. Who decides how much to spend and what to spend it on? Here, after the arm's-length transaction, it was the acquiring CVR that decided to inject $130 million in capital and new capital for safety. That spending was personally directed by CVR's vice president of safety and executive vice president of operations, who had seconded to the refinery. The final point that is important to understand about is that the commission applied the wrong legal standard by not considering all three factors of the substantial continuity test, but the reality is the commission did consider all three factors and, in fact, expressed specific individual factual findings as to each of the three factors. I'm sorry. I didn't mean to interrupt in the middle of the thought, but let me test that. In footnote 14 of the decision, it said, we agree that the last prong of the three-part substantial continuity test was not met in this case and that the two companies are therefore not the same employer for repeat characterization purposes, I'm sure, and Walter, end quote. The way I read both page 14 and footnote 14 was that even though they had just acknowledged that the other two factors cut the other way, that because this one factor relying on what you're saying doesn't even relate to the third factor, but it relates to whether or not it's an alter ego, this expenditure of $130 billion, because the review commission said that the change in personnel cut differently, that's dispositive. In other words, it suggested that the secretary had to satisfy all three elements rather than to balance the third element that cut in favor of what he would versus the first two factors that weighed in favor of the secretary. Your Honor, we read the commission's decision differently, not that it didn't consider all three factors and not that it considered a requirement for all three to exist. They clearly state a legal test that requires an evaluation of the totality of circumstances. And one thing they do say, not just the commission in this case, but the commission in all such cases, has said that the most important factor, not that it's the only factor and not that it alone decides the case, but the most important factor is the continuity of safety decision makers. And that's why in this case and in all such other similar cases, the commission found that the factual evidence of change in decision makers or continuity of decision makers in the cases defined successorship weighs heavily in the analysis, not that it weighs exclusively. And that's exactly what happened in this case, is that the commission and the safety decision makers, and that as that is the most important factor, and as that breaking continuity was so complete, that that outweighed the other two factors, which it also considered and which it also reached a factual determination about. And that ultimately, Your Honor, was the commission's factual judgment for which this court reviews under a substantial evidence standard. There are a couple of... Go ahead. Let me just ask one follow-up question. If the review commission had said something along the following, that the first two factors cut in favor of the secretary, the last element cuts in favor of Wynniwood, but because there is only a successor liability if the secretary satisfies all three elements, that Wynniwood LLC is a different employer than Wynniwood Company, would that have been error by virtue of applying the wrong legal test? Well, first of all, just to reiterate, that's not what the commission did. The commission considered all three and a totality of the circumstances, but I don't believe it would be error to do that, Your Honor. I think if you look at the case law from the commission on substantial continuity, whether you call it substantial continuity or alter ego, the history of the commission's test is essentially, in substance, one of alter ego, because the purpose is to event sham transactions and manipulation by employers. The most important factor, as they've said consistently since establishing the test, is the continuity of the decision maker, that that is essential to establishing continuity or to breaking continuity for purposes of the successorship analysis, but we don't have to get there in this case, because the commission did reach a factual finding about all three and did express that on balance, the totality of the circumstances weighed in favor of breaking that chain of liability, because the change in safety decision makers was so extreme. A couple of additional points I'd like to make on the... Well, yeah, let me... Yeah. So, it's my fault that you're substantially out of time, but I'm going to give you 45 seconds to wrap up. Appreciate that, Your Honor. Just a couple of quick points on rebuttal about the PSM issues. To Judge Moritz's point about interconnection, even if you accept that the standard does not require a causal effect from interconnection to cause a potential release of HHCs, it's important to understand that there is actually no interconnection of the vessels in this case. To determine that there was actual interconnection, the review commission looked at a general purpose dictionary and then misread it anyway. The dictionary definition that the commission looked at says that interconnect means to connect mutually or with one another. If you look at a more technical dictionary, like the Oxford English Dictionary, it talks about connecting with the other to connect by reciprocal links. The import of both of these definitions is that one acts directly on the other. Yes, Your Honor. You didn't make that argument to your reply brief. Is that correct? Well, we were responding to the government's argument that purported to establish interconnection and in the briefing we did address that in our reply brief. Thank you. And here, Your Honor, we would say most definitely that these two vessels do not act upon each other. They do not connect directly with each other. There are no reciprocal links. There is a series or network of piping that connect to headers or connect to storage tanks that run to another intricate network of piping and therefore these are clearly not interconnected. If OSHA wanted to use the word connection to imply any level of connection, they would have said so. By using interconnection, they imply something that acts more directly upon the other. The other point I want to make, Your Honor. Well, yeah, before you do that, I think, Kevin, has he used his 45 seconds? Yeah, yeah, he has. Okay, yeah. I'm sorry, Mr. Codd. But Judge Morris, did you have any follow-up questions? No, I did not. All right. Judge Murphy, did you? No, I did not. Okay. Well, nor do I. So, I'm afraid I know both of you have more to say. It was extraordinarily well presented, both in debrief and orally today. And on behalf of our panel, we greatly appreciate the excellent advocacy of all of the attorneys in the case. So, this case will be submitted.